(66 South. 257)

No. 19859.

TOWN OF EUNICE v. LOUISIANA WESTERN RY. CO.

(June 29, 1914. Rehearing Denied Oct. 22, 1914.)

*(Syllabus by the Court.)*

EMINENT DOMAIN (§§ 47, 128*)—CONDEMNATION FOR STREET—DETERMINATION OF COMPENSATION—RAILROAD RIGHT OF WAY—EXPROPRIATION.

The general authority vested in a municipal corporation to expropriate land for the open-

ing or extension of a street is sufficient for the purposes of a suit against a railroad company for the extension of a street across its right of way and tracks, provided the company is not thereby deprived of the beneficial use of the land; and the fact that the municipality does not take, nor the company lose, the property altogether, but that, apart from the benefit that the company itself will derive from the use of the land, as a street, it will continue to enjoy the right to maintain and use its tracks thereon, is properly taken into consideration in determining the compensation to which it is entitled.

[Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. §§ 107–120, 349–351; Dec. Dig. §§ 47, 128.*]

Appeal from Sixteenth District Court, Parish of St. Landry; B. H. Pavy, Judge.

Expropriation proceedings by the Town of Eunice against the Louisiana Western Railway Company. From a judgment for plaintiff, defendant appeals. Affirmed.

The following is a copy of the plat referred to in the opinion:

Denegre, Leovy & Chaffe, of New Orleans, and E. B. Dubuisson, of Opelousas, for appellant. William J. Sandoz, of Opelousas, for appellee.

MONROE, C. J. Defendant prosecutes this appeal from a verdict and judgment decreeing the expropriation of a strip of land, measuring 72x280 feet, across its right of way, for the extension of "Park avenue," in the town of Eunice, and awarding it $500, "for land and all damages." Plaintiff has answered the appeal, and prays that the award be decreased to $250. The strip which is sought to be expropriated is designated, on the subjoined "sketch" (made up from several blueprints, etc., offered in evidence, and sufficiently accurate for purposes of illustration), as "Proposed St.," and, as may be seen, extends from "Public Grounds" (which include part of First street), on the west, to "block 88," on the east.

It appears from the evidence that the site upon which the town of Eunice was thereafter located was surveyed in 1894, and included a tract of land 1½ miles square, and that, according to the plat, which was recorded in September, 1894, the intersection of Park avenue and the railway right of way is the center from which the town extends for three-quarters of a mile towards each of the four points of the compass, the avenue running east and west and the railway right of way, north and south, that each of the avenues and streets of the town measures 70 feet in width, with the exception of Park avenue, which is 150 feet wide, and East street, which is 80 feet wide, and that the right of way is 280 feet in width. East street, it will be observed, between Laurel and Maple avenues, lies immediately to the eastward of, and adjoins, blocks 88 and 89, which are 100 feet in width and are parallel with and adjoin the right of way, having been laid off with a view to the establish-

ment of industrial enterprises. According to the original plat, there was no opening from West Eunice into East street, between Laurel and Maple avenues (a distance of 2,670 feet), save Oak avenue, and there was no opening from East street into East Eunice, save North street, the western terminus of which was the east line of block 88. The existence of the narrow passage lying to the southward of, and parallel with, North street is somewhat apocryphal, and, though it is shown that there is an appearance of a "Newly Cut Road" at the place indicated on the sketch, it is not altogether clear that the cutting was done by, or with, the approval of the owner of the land, or that the land has been dedicated to the public. It will be observed, also, that there is no public passage through the right of way, between Laurel and Oak avenues (a distance of 1,490 feet), from West Eunice, even so far as block 88, which is occupied by industrial and mercantile establishments, etc., including feed stores, ice factory, iron works, grocery stores, etc., though it appears that defendant permits and facilitates the passing of persons and vehicles in either direction, across its right of way, along the route indicated by the dotted line, running between the north end of its "Depot" and the south end of its "Platform."

Defendant derives title to the right of way in question from an act of donation inter vivos, of date January 10, 1895, in which the consideration is said to have been the facts that, by reason of the location and construction of defendant's road, pursuant to agreement, the donor had been enabled to lay off into squares and lots, and to sell at an advanced price, an unproductive body of land "now * * * styled * * * the town of Eunice," and counsel for defendant make the statements, which appears to be well founded, "that, but for the building of a branch line by defendant from its main line, from Midland Junction to the town site, there would have been no town of Eunice," and, "as the railroad was the mother of the town, it was laid off so as to fructify and grow around the terminals granted to the railroad company."

They, however, contend that, though under its power of eminent domain, plaintiff may lay out and open streets and expropriate private property for that purpose, and, though, as a general proposition, it might open a street across the right of way and tracks of a railroad company, there is a well-defined exception to the exercise of the power last mentioned, which is that, in the absence of express legislation, a municipal corporation cannot open a street across a railroad company's terminal grounds, station, or yard when to do so would be to destroy or impair the usefulness of the same. It is also said that the purpose of the present attempt is to facilitate a rival railroad company, which has been given possession of East street, and now wishes to establish a depot upon certain lots, in block 88, which it has acquired, and which adjoin, on the north side, the strip of land which it is proposed to expropriate. In the alternative, it is said that $500 is an insufficient amount to compensate the loss and damage which defendant will sustain as the result of the expropriation.

Eight witnesses, including the mayor and alderman, the town engineer, superintendent of waterworks, and business men were examined as witnesses for plaintiff. Thirteen witnesses, including defendant's superintendent, one or two assistant engineers, right of way agent, train conductor, together with several business men, were examined as witnesses on behalf of defendant. According to the consensus of the testimony, Eunice has a population of about 2,000, most of whom reside on the west side of defendant's right of way, though there are said to be 10

or 15 white families and quite a number of negroes living upon the east side, and two or three "additions" to the town have been laid off on that side. The two principal business streets are Park avenue and Second street, and the center of business is, probably, about the corner of Second street and Walnut avenue. It is shown that a petition, signed by more than 70 citizens, requesting the extension of Park avenue, as proposed, was presented to the mayor and council, and that they thereupon passed an ordinance providing that the proper steps should be taken to that end. We are satisfied from the testimony that the interests of the citizens as a body demand that a passage should be opened across the right of way in question, at some point between Laurel and Oak avenues, and we find nothing to the contrary that is entitled to serious consideration. The only question, in that connection, then, is whether it would be better to extend Park avenue or Ash avenue, which is one square below. The argument in favor of Park avenue is that it is the widest and most central in the town, that it is the second business thoroughfare, and is nearer to the business, as well as the geographical, center of the town than Ash avenue, and that it lies midway between Laurel and Oak avenues, which are already so extended, whereas Ash avenue is 1,190 feet below Laurel and 300 feet above Oak. The main objection urged by defendant is that the extension of Park avenue in such proximity to the south end of its depot will render the handling of its business at that point dangerous, will subject it to the necessity of changing the positions of its depot and cotton platform, and will require the erection of a water crane (in addition to the tank), and hence that the case falls within the exception, rather than the rule, with respect to the exercise by plaintiff of the power of eminent domain. Defendant's employés testify to the danger which, they say, will render the changes mentioned necessary, but none of them explain intelligibly why it will be more dangerous to have a public crossing at one end of its depot, which, being a street of the town, will be subject to municipal control, than it is (as the matter now stands) to have a private crossing, which being on private property, is not subject to such control (to the same extent), at the other end of the depot, and passing between the depot and the cotton platform. It was said, in the course of the argument, that defendant's witnesses, being railroad men, should be regarded as experts, better qualified than the ordinary individual to testify in such matters, which would be true if they were railroad men engaged in the operation of trains in and out of the depot at Eunice, or so situated as to have the operation of such trains constantly under their eyes; and, if the locomotive engineer, so engaged, or the local agent, so situated, had been called to the stand, we should have been willing to concede a good deal to them because of their opportunities. But, as between an assistant civil engineer, a right of way agent, or any other officer, who has nothing to do with the operation of trains, and whose duties, such as they are, rarely call him to the scene, we should prefer the testimony of the ordinary citizen, who, like Mr. Fusilier, for instance, having his place of business at the particular depot in question, has seen the trains arrive and depart every day since the road was built. In fact, it requires no expert knowledge to enable a man to understand that a railroad crossing is dangerous; but, even Mr. Mimms, division superintendent of the road of which we understand the Louisiana Western to be a mere feeder, or subsidiary, and whose testimony shows a thorough knowledge of his business, does not explain why a public crossing at the southern end of the Eunice depot should be more dangerous than the

private crossing which defendant now maintains at the northern end, or why it should be necessary to move the depot or platform, or extend the house track, in the one case and not in the other.

The train conductor, who might be supposed to know something of the danger of maintaining a crossing in a "railroad yard," over a house track, a main track, and an industrial track, and between the end of a depot and a cotton platform, tells of the establishment of the crossing in question as follows:

"After the Frisco put the tracks in East street, Lewis and Long made a request for a private crossing—they couldn't work on East street on account of the condition made by the Frisco railroad tracks. It was immediately granted them. We built them a little road over our track, and made it with an easy rise, so it would not be hard on the teams. It seemed to appeal to the people so much—that lived on Laurel street—that somebody went to the trouble of bridging it over the canal, which is spoken of as the Frisco canal. It is now traveled by every heavy load that comes along. They know that Laurel, which is kept up by the Frisco, is almost impassable to go over with their loads, so they take the easy line to go there; that is, the longest way round is the shortest way home."

Again, defendant's witnesses, upon direct examination, seemed to think that a water crane would be indispensable, in the event, of the opening of Park avenue, as proposed, and yet it was developed on cross-examination that the north-bound train (and it may be here remarked that, save upon exceptional occasions, as we understand, there are but two trains passing Eunice in a day—the one going north, in the morning, the other, going south, in the evening) stops at the tank and takes water, before reaching the depot, and that the south-bound train stops at the depot, while the locomotive goes on to the tank; and it is conceded that the same thing can, and will, be done if Park avenue is opened.

The rule invoked by defendant's counsel is much more restricted in its application to cases, such as this, where the grantee continues to enjoy the beneficial use of the land, than where the grantee is deprived of such use. Thus:

"With respect to railroad yards, it is held that no special legislation is necessary to enable a municipality to extend a street over land used by a railroad company as a yard, provided the company is not thereby deprived of the beneficial use of the property, otherwise, if this will be the necessary effect of the extension. The general authority to condemn lands for streets or highways or to extend them to cross railroad tracks has uniformly been held to authorize the extension of street or highways across a railroad track, without any other legislative authority. While danger and delays are necessarily incident to railroad crossings, the use may be so adjusted as to work no serious detriment to the public interest." 15 Cyc. 624, and authorities there cited.

The question of the amount to which defendant may be entitled was peculiarly within the province of the jury of property owners, and a careful consideration of the matter fails to satisfy us that any mistake has been made. The lots on block 88, measuring, each, 50x100 feet, are said to be worth about $300 each, and it is argued that, as the strip in controversy has, say, four times the superficial area of one such lot, it should be worth four times that amount. But plaintiff does not take the strip altogether, nor does defendant altogether lose it. Plaintiff gets the use of the property for street purposes, and, apart from the benefit that defendant may derive from its use in that way, it will continue in the enjoyment, to a great extent, of the special use that it now enjoys; that is to say, it will continue to maintain thereon and to use its three tracks. But, even if it were otherwise, and plaintiff were at liberty to make some other use of the strip than that which it proposes to make, there is but little of it that is susceptible of any other use, since the greater proportion is shut in between either the house and the main track or the main track and the industrial track.

We conclude, therefore, that the judgment appealed from should be affirmed, at the cost of the plaintiff; and it is so ordered.